## JOHN A. CAMPBELL *v.* BOARD OF EDUCATION OF THE TOWN OF NEW MILFORD ET AL.
### (11507)

SPEZIALE, C. J., PETERS, HEALEY, SHEA and GRILLO, Js.

Argued March 1—decision released May 1, 1984

94

*Shelley White,* with whom, on the brief, were *Margaret Hayman* and *Martha Stone,* for the appellant (plaintiff).

*Thomas N. Sullivan,* for the appellees (defendants).

PETERS, J. This case concerns the validity of the policy of a local school board that imposes academic sanctions for nonattendance upon high school students. In a class action brought by the named plaintiff, John A. Campbell, for himself and others similarly situated, the plaintiff class sought injunctive and declaratory relief, mandamus, and compensatory damages from the named defendant, the New Milford board of education, and others.[1] The plaintiff claimed that the defendants' policy was ultra vires in light of governing state statutes, and unconstitutional in light of operative provisions of the Connecticut constitution and the United States constitution. The trial court rendered judgment for the defendants and the plaintiff has appealed.

The underlying facts are undisputed. The New Milford attendance policy, set out in an annually distributed student handbook, provides two sets of academic sanctions for students who are absent from school. Course credit is withheld from any student who, without receiving an administrative waiver, is absent from any year-long course for more than twenty-four class periods.[2] In the calculation of the twenty-four maxi-

---

[1] The other defendants were the individual members of the New Milford board of education and the principal and vice-principals of the New Milford High School.

[2] There are pro rata adjustments for courses that do not run for the full year or meet less than five periods per week.

mum absences, all class absences are included except absences on school-sponsored activities or essential administrative business. In addition to the twenty-four absence limit, the course grade of any student whose absence from school is unapproved is subject to a five-point reduction for each unapproved absence after the first. In any one marking period, the grade may not, however, be reduced to a grade lower than 50, which is a failing grade. The grade reduction for unexcused absences is, like the twenty-four maximum absence policy, subject to administrative waiver. The policy of the school board entails extensive opportunities for counseling after a student's first confirmed unapproved absence from a class and thereafter.

The stated purpose of the attendance policy is educational rather than disciplinary. A student's disciplinary suspension from school, for reasons unrelated to attendance, is considered an approved rather than an unapproved absence. Such an absence cannot result in the diminution of a class grade although it may be counted, unless waived, as part of the twenty-four maximum absences for class credit. A student's absence from school, whether approved or unapproved, is not a ground for suspension or expulsion.

A student's report card lists, for each course, grades for each marking period, a final examination grade, a final grade, the amount of credit awarded, and the number of approved and unapproved absences. The report card conspicuously bears the following legend: "A circled grade indicates that the grade was reduced due to unapproved absences." In the case of the named plaintiff, his report card indicated grade reductions by the circling of grades in each of his academic courses, with the result that in three of the courses his final grade was lowered from passing to failing.[3] In a fourth

---

[3] The number of five point grade reductions was reflected on the plaintiff's report card by the number of unapproved absences in each course.

course, Architectual Drafting II, where the plaintiff's final grade was passing despite an indicated reduction for unapproved absences, the report card assigned him no credit because of a total of thirty-eight absences, thirty-one of which were approved and seven of which were unapproved. Any report card thus discloses, on its face, those grades which are affected by the enforcement of the attendance policy.

The plaintiff's appeal argues that the trial court erred in ruling that the defendants' attendance policy: (1) was not ultra vires or preempted by governing state statutes; (2) did not violate the rights of the plaintiff class to substantive due process under the Connecticut and the United States constitutions; (3) did not deprive the plaintiff class of procedural due process under the Connecticut and the United States constitutions; (4) did not deny the rights of the plaintiff class to equal protection of the law under the Connecticut and the United States constitutions. We find no error.

I

The plaintiff's first argument on appeal is that the defendant school board's policy is invalid because it conflicts with a number of state statutes. This argument is twofold, that the attendance policy is ultra vires because it exceeds the authority conferred upon local school boards by state law and that the policy is preempted by state statutes with which it is inconsistent. We find neither argument persuasive.

The authority of local boards of education derives from their role as agents of the state. "[T]he furnishing of education for the general public, required by article eighth, § 1, of the Connecticut constitution, is by its very nature a state function and duty." (Footnote

It is, therefore, possible to compute from the plaintiff's report card what his grades would have been but for the operation of the challenged grade reduction policy.

omitted.) *Murphy* v. *Board of Education,* 167 Conn. 368, 372, 355 A.2d 265 (1974). This responsibility has been delegated to local boards which, as "agencies of the state in charge of education in the town . . . possess only such powers as are granted to them by the General Statutes expressly or by necessary implication." *Herzig* v. *Board of Education,* 152 Conn. 144, 150, 204 A.2d 827 (1964); *City Council* v. *Hall,* 180 Conn. 243, 248, 429 A.2d 481 (1980).

The trial court found authority for the defendant school board's attendance policy in General Statutes §§ 10-220 and 10-221.[4] The first of these statutes,

---

[4] "[General Statutes] Sec. 10-220. DUTIES OF BOARDS OF EDUCATION. (a) Each local or regional board of education shall maintain good public elementary and secondary schools, implement the educational interests of the state as defined in section 10-4a and provide such other educational activities as in its judgment will best serve the interests of the school district; provided any board of education may secure such opportunities in another school district in accordance with provisions of the general statutes and shall give all the children of the school district as nearly equal advantages as may be practicable; shall have charge of the schools of its respective school district; shall make a continuing study of the need for school facilities and of a long-term school building program and from time to time make recommendations based on such study to the town; shall have the care, maintenance and operation of buildings, lands, apparatus and other property used for school purposes; shall determine the number, age and qualifications of the pupils to be admitted into each school; shall employ and dismiss the teachers of the schools of such district subject to the provisions of sections 10-151 and 10-158a; shall designate the schools which shall be attended by the various children within the school district; shall make such provisions as will enable each child of school age, residing in the district to attend some public day school for the period required by law and provide for the transportation of children wherever transportation is reasonable and desirable, and for such purpose may make contracts covering periods of not more than five years; may arrange with the board of education of an adjacent town for the instruction therein of such children as can attend school in such adjacent town more conveniently; shall cause each child seven years of age and over and under sixteen living in the school district to attend school in accordance with the provisions of section 10-184, and shall perform all acts required of it by the town or necessary to carry into effect the powers and duties imposed by law.

"(b) The board of education of each local or regional school district shall, with the participation of parents, students, school administrators, teach-

§ 10-220, requires a local school board to "implement the educational interests of the state" and to "provide such other educational activities as in its judgment will best serve the interests of the school district." The second statute, § 10-221, instructs local boards of education to "prescribe rules for the management, studies, classification and discipline of the public schools." In

ers, citizens, local elected officials and any other individuals or groups such board shall deem appropriate, prepare a statement of educational goals for such local or regional school district. The statement of goals shall be consistent with statewide goals pursuant to subsection (c) of section 10-4 and shall be submitted to the state board of education on or before July 1, 1981. The state board of education shall review each such statement of goals and approve such statement of goals only as it pertains to the statewide goals developed in accordance with subsection (c) of section 10-4. Every five years thereafter, the local or regional board of education shall review and if necessary update such statement of goals. The local or regional board of education shall submit such goals to the state board of education, which shall review each such statement of goals and approve such statement of goals only as it pertains to the statewide goals developed in accordance with subsection (c) of section 10-4. Each local or regional board of education shall develop student objectives which relate directly to the statement of educational goals prepared pursuant to this subsection and which identify specific expectations for students in terms of skills, knowledge and competence. On September 1, 1982, and annually thereafter, at such time and in such manner as the commissioner of education shall prescribe, each local or regional board of education shall attest to the state board of education that program offerings and instruction are based on stated educational goals and student objectives pursuant to this subsection."

"[General Statutes] Sec. 10-221. BOARDS OF EDUCATION TO PRESCRIBE RULES. (a) Boards of education shall prescribe rules for the management, studies, classification and discipline of the public schools and, subject to the control of the state board of education, the textbooks to be used; shall make rules for the control, within their respective jurisdictions, of school library media centers and approve the selection of books and other educational media therefor, and shall approve plans for public school buildings and superintend any high or graded school in the manner specified in this title.

"(b) Boards of education may prescribe rules to impose sanctions against pupils who damage or fail to return textbooks, library materials or other educational materials. Said boards may charge pupils for such damaged or lost textbooks, library materials or other educational materials and may withhold grades, transcripts or report cards until the pupil pays for or returns the textbook, library book or other educational material."

addition, the trial court noted that General Statutes §§ 10-184 and 10-199[5] permit local school boards to investigate and to regulate "the irregular attendance of pupils at school." General Statutes § 10-199.

The plaintiff contends that these statutes do not furnish support for the defendant school board's policy because its policy is properly to be characterized not as an academic regulation assigning a uniform grading value to classroom presence but rather as unauthorized punishment for nonattendance. The plaintiff concedes that school boards may properly require classroom teachers to take classroom participation into

[5] "[General Statutes] Sec. 10-184. DUTIES OF PARENTS. All parents and those who have the care of children shall bring them up in some lawful and honest employment and instruct them or cause them to be instructed in reading, writing, spelling, English grammar, geography, arithmetic and United States history and in citizenship, including a study of the town, state and federal governments. Each parent or other person having control of a child seven years of age and over and under sixteen years of age shall cause such child to attend a public day school regularly during the hours and terms the public school in the district wherein such child resides is in session, or while the school is in session in which provision for the instruction of such child is made according to law, unless the parent or person having control of such child is able to show that the child is elsewhere receiving equivalent instruction in the studies taught in the public schools. Children over fourteen years of age shall not be subject to the requirements of this section while lawfully employed at labor at home or elsewhere; but this provision shall not permit such children to be irregular in attendance at school while they are enrolled as pupils nor exempt any child who is enrolled as a member of a school from any rule concerning irregularity of attendance enacted by the board of education having control of the school."

"[General Statutes] Sec. 10-199. ATTENDANCE OFFICERS. DUTIES. Any local or regional board of education may appoint one or more persons, who shall be authorized to prosecute for violations of the laws relating to attendance of children and their employment. All warrants issued upon such prosecutions shall be returnable before any court having jurisdiction. Each attendance officer shall be sworn to the faithful performance of his or her duties and shall be under the direction of the principal or superintendent of schools of the board of education by which he or she is employed. He shall investigate the absence of pupils from or the irregular attendance of pupils at school, cause such pupils as are absent or irregular in attendance to attend school regularly and present cases requiring prosecution for violation of the school laws to prosecuting officers."

account in assigning numerical grades. Boards of education, however, according to the plaintiff, may not prescribe school-wide rules for nonattendance except by way of imposition of disciplinary sanctions of suspension and expulsion in accordance with the narrow and specifically defined procedures permitted by General Statutes §§ 10-233a through 10-233f.

We do not read the school board's authority in so limited a fashion. The authority to adopt uniform rules concerning irregularity of attendance is necessarily implied in the conjunction of statutory provisions authorizing local implementation of the educational mission of the state. Significantly, § 10-220 expressly charges local boards with responsibility for the oversight of the school attendance of children from the ages of seven to sixteen made mandatory by § 10-184. Furthermore, the plaintiff's concession that school teachers, upon the instruction of local school boards, may properly consider class participation in the assignment of grades, logically implies the existence of an educational nexus between classroom presence and grading. If local school boards can delegate to others the authority to impose academic sanctions for nonattendance, the decision to adopt uniform school-wide rules for such sanctions can hardly be deemed ultra vires.

None of the out-of-state cases upon which the plaintiff relies compels the conclusion that school-wide academic sanctions for nonattendance should generally be adjudged to be ultra vires. It may well be improper to reduce a student's grade for nonattendance as an additional punishment for unrelated conduct leading to a suspension from class; *Gutierrez* v. *School District R-1,* 41 Colo. App. 411, 413, 585 P.2d 935 (1978); *Dorsey* v. *Bale,* 521 S.W.2d 76, 78 (Ky. 1975); but this school board's program does not permit such double punishment. It would indubitably be unlawful to apply a nonattendance program in an unreasonable, capri-

cious, arbitrary or inequitable manner; *State ex rel. Miller* v. *McLeod,* 605 S.W.2d 160, 162 (Mo. App. 1980); *State ex rel. Sageser* v. *Ledbetter,* 559 S.W.2d 230, 234 (Mo. App. 1977); but no such allegation has been factually demonstrated. It would finally be troublesome to bar a truant student from further class attendance and from taking a final examination; *Matter of Blackman* v. *Brown,* 100 Misc. 2d 566, 568, 419 N.Y.S.2d 796 (S. Ct. 1978); but the defendant board's program neither removes such a student from class nor excuses further compliance with the state's compulsory education law. In short, the plaintiff has cited no authority for his claim that attendance rules promulgated by local school boards, if carefully drafted and fairly applied, are to be deemed per se ultra vires. Our own research has likewise revealed no such caselaw. We agree that such regulations fall within the authority granted to local school boards by the statutes of this state.

In the alternative, the plaintiff maintains that the defendant school board's attendance policy is preempted by state statutes governing school attendance. The trial court recognized that the state has enacted legislation dealing with truancy but held that the New Milford attendance policy "does not impinge or encroach upon that area of attendance covered by state statute." The plaintiff's argument to the contrary is that the state statutes which require daily attendance at school under threat of a court-imposed fine; General Statutes §§ 10-184, 10-185 and 10-199;[6] are thwarted by a local school board policy which creates incentives

---

[6] General Statutes § 10-185 provides as follows: "PENALTY. Each week's failure on the part of a person to comply with any provision of section 10-184 shall be a distinct offense, punishable by a fine not exceeding five dollars. Said penalty shall not be incurred when it appears that the child is destitute of clothing suitable for attending school and the parent or person having control of such child is unable to provide such clothing. All offenses concerning the same child shall be charged in separate counts in one complaint. When a complaint contains more than one count, the court may give sen-

for a student with a poor attendance record to give up on the term's work and to leave school. Furthermore, since the state statutes impose criminal sanctions for nonattendance, the plaintiff contends that a local school board is precluded from imposing alternative or additional sanctions by way of academic penalties. Finally, the plaintiff urges that the state statutes governing academic discipline, which require that a suspended or expelled student be afforded alternate educational opportunities; General Statutes §§ 10-233c and 10-233d; be read as a mandate that any student be given full academic credit for completion of academic work, and as a prohibition of locally-imposed academic sanctions for nonattendance.

The defendant school board's reply to these arguments calls upon us to recognize a distinction between sanctions which are disciplinary in nature and sanctions which relate to academic requirements. The question is not whether we concur in the judgment of the defendant board of education that "[l]earning experiences that occur in the classroom are . . . essential components of the learning process" or that "[t]ime lost from class tends to be irretrievable in terms of opportunity for instructional interaction." The policy decision that academic credentials should reflect more than the product of quizzes, examinations, papers and classroom participation nonetheless constitutes an academic judgment about academic requirements. We agree with the defendants' characterization of their policy.

Although the plaintiff's expert witnesses opined that the defendants' policy is punitive in effect and operates to deter rather than to encourage school attend-

tence on one or more counts and suspend sentence on the remaining counts. If, at the end of twelve weeks from the date of the sentence, it appears that the child concerned has attended school regularly during that time, judgment on such remaining counts shall not be executed."

See footnote 5, supra, for the text of General Statutes §§ 10-184 and 10-199.

ance, the plaintiff adduced insufficient evidence to support these hypotheses. Indeed, the named plaintiff, after a junior year marred by repeated absences, many unexcused, had no difficulty meeting attendance requirements in the senior year, and graduated with his class in timely fashion. The record reveals only one student's failure to complete high school, allegedly because of the defendants' attendance policy. Without further probative evidence that the defendants' policy is disciplinary in intent or in effect, we cannot conclude that it operates in a manner that conflicts with state statutes governing compulsory school attendance or student discipline. See *Connecticut Theatrical Corporation* v. *New Britain,* 147 Conn. 546, 552, 163 A.2d 548 (1960).

## II

Even if the defendant school board's attendance policy is authorized by the relevant state statutes, the plaintiff class asserts that the policy cannot pass constitutional muster. The plaintiff relies on provisions of our state and federal constitutions to raise three different constitutional claims: a right to substantive due process, a right to procedural due process, and a right to equal protection of the laws. The trial court, upon consideration of these claims, found no infringement of the plaintiff's constitutional rights. We agree.

## A

The plaintiff's challenge to the New Milford attendance policy as violative of the requirements of substantive due process claims infringement of students' fundamental rights to public education, of students' liberty interests in their academic reputation and of students' property interests in grades reflecting academic achievement. The first of these claims is based on article

eighth, § 1, of the Connecticut constitution;[7] the others rely on article first, §§ 8 and 10, of the Connecticut constitution[8] and the fourteenth amendment to the United States constitution.[9]

Of these substantive due process claims, the most serious is the charge of impairment of a fundamental right, because, if such an impairment were properly before us, the validity of the questioned governmental regulation would require strict scrutiny to determine whether the regulation was compellingly justified and narrowly drafted. *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 285, 455 A.2d 1313 (1983). We must therefore decide the applicability of the fundamental rights guaranteed by article eighth, § 1, to a school board's policy of imposing uniform school-wide academic sanctions for nonattendance. In *Horton* v. *Meskill*, 172 Conn. 615, 648–49, 376 A.2d 359 (1977), we held, in

---

[7] Article eighth, § 1, of the Connecticut constitution provides as follows: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."

[8] Article first, §§ 8 and 10, of the Connecticut constitution provide as follows:

"Sec. 8. In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury, except in the armed forces, or in the militia when in actual service in time of war or public danger."

"Sec. 10. All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[9] The fourteenth amendment to the constitution of the United States provides in part: "No State shall . . . deprive any person of life, liberty or property, without due process of law."

the context of state-wide disparities in the financing of public school education, that "elementary and secondary education is a fundamental right, [and] that pupils in the public schools are entitled to the equal enjoyment of that right." The plaintiff argues that *Horton* v. *Meskill* implies that strict scrutiny must be the test for any and all governmental regulations affecting public school education. We disagree. The underlying issue in *Horton* v. *Meskill* was the provision of "a substantially equal educational opportunity" for Connecticut students in the state's "free public elementary and secondary schools." Id., 649. This school board policy, which is neither disciplinary; see *Mitchell* v. *King,* 169 Conn. 140, 144–45, 363 A.2d 68 (1975), and compare *Board of Curators of the University of Missouri* v. *Horowitz,* 435 U.S. 78, 86–87, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978); nor an infringement of equal educational opportunity, does not jeopardize any fundamental rights under our state constitution.

The standard by which the plaintiff's remaining substantive due process claims must be measured is therefore the more usual rational basis test. *Caldor's, Inc.* v. *Bedding Barn, Inc.,* 177 Conn. 304, 314–15, 417 A.2d 343 (1979). In order to succeed on these claims, the plaintiff bears the heavy burden of proving that the challenged policy has no reasonable relationship to any legitimate state purpose; *Caldor's, Inc.* v. *Bedding Barn, Inc.,* supra, 314–15; *Pierce* v. *Albanese,* 144 Conn. 241, 249, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21 (1957); and that the plaintiff class has suffered a specific injury as a result of the policy's enforcement. *Gentile* v. *Altermatt,* 169 Conn. 267, 307, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); *Hardware Mutual Casualty Co.* v. *Premo,* 153 Conn.

465, 471, 217 A.2d 698 (1966). The plaintiff has established neither the legal nor the factual predicate for meeting this burden of proof.

The plaintiff argues that it is unconstitutionally arbitrary and capricious for the defendant school board to require student grades to reflect more than academic achievement. With respect to the plaintiff's liberty interest, we can find no factual impairment of whatever rights the plaintiff might possibly assert. Inspection of the report card of the named plaintiff discloses the relationship between his academic performance and the reduction in his grades and class credit that resulted from application of the attendance policy. The plaintiff has failed to show how a student's reputation could be injured by a report card in this form. With respect to the plaintiff's property interest, we find it difficult to understand how a uniform school-wide policy that links class grades with attendance can be on its face more arbitrary, as a constitutional matter, than are similar judgments by individual teachers who may justifiably, according to the plaintiff, adjust classroom grades to reflect classroom participation. Furthermore, the trial court made no findings of fact that application of the attendance policy was arbitrary or capricious in the only two specific cases about which evidence was adduced at trial. On this record, the plaintiff class has not proven infringement of its liberty or property interest in a fair grading system.

The plaintiff argues finally that impermissible vagueness in the waiver provisions that ameliorate the potential rigor of the defendant board's attendance policy requires the conclusion that the policy is substantively unconstitutional. The policy of grade reduction is subject to waiver for "outstanding performance," and denial of class credit may be waived in extenuating circumstances calling for "special consideration." These provisions for waiver are unconstitutional, according

to the plaintiff, because they permit school administrators to exercise unbridled discretion and hence invite arbitrary action. It is, however, by no means clear that provisions for waiver, which necessarily depend upon the equities of particular circumstances, require the same degree of precision as must accompany the imposition of sanctions in the first instance. See *Connecticut Board of Pardons* v. *Dumschat,* 452 U.S. 458, 466–67, 101 S. Ct. 2460, 69 L. Ed. 2d 158 (1981). Significantly, the plaintiff's challenge for vagueness does not contest any part of the attendance policy other than its provisions of waiver. In any case, the plaintiff class has again failed to make the factual showing necessary to prove that it has suffered a constitutional injury. See *Broadrick* v. *Oklahoma,* 413 U.S. 601, 610, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973). The record contains no findings that any member of the class in fact misunderstood the waiver policy or was deprived of a waiver because of ambiguity in its statement. The plaintiff's claim of unconstitutional vagueness therefore cannot succeed.

B

The plaintiff also claims a deprivation of procedural due process.[10] The plaintiff maintains that the New Milford attendance policy fails to provide constitutionally mandated basic procedural safeguards because students are not given notice of the dates of their alleged absences and are not afforded the opportunity to contest the imposition of an academic penalty, either at an internal hearing or before the board of education. These omissions, according to the plaintiff, jeopardize accurate and fair application of the defendants' policy.

---

[10] These claims are based on article first, §§ 8 and 10, of the Connecticut constitution and the fourteenth amendment to the United States constitution.

Before we can consider this claim on its merits, we must clarify the standards that govern procedural fairness in a school setting. We have already held that the defendants' policy is academic rather than disciplinary in intent and effect, and that the policy impairs no fundamental rights. The Supreme Court of the United States has recently determined that flexible standards of procedural due process call for "far less stringent procedural requirements in the case of an academic dismissal" than for a dismissal based on disciplinary reasons. *Board of Curators of the University of Missouri* v. *Horowitz,* 435 U.S. 78, 86–87, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978). Compare *Goss* v. *Lopez,* 419 U.S. 565, 581, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975). That court found it compelling that academic evaluations of a student necessarily depend upon professional judgments that are "more subjective and evaluative than the typical factual questions presented in the average disciplinary decision." *Board of Curators of the University of Missouri* v. *Horowitz,* supra, 90. For similar reasons, it is appropriate for this court to defer to the policy judgments of the academic administrators who formulated the defendant school board's attendance program.[11] Such deferral does not of course obviate the fundamental requirements of procedural due process that a student must be given adequate notice of the program, and a meaningful timely opportunity to be heard. It does, however, mean that notice and hearings need not take any one particular form in order to pass constitutional muster.

In this case, the plaintiff does not argue that students at New Milford High School were not provided with sufficient notice of the existent attendance policy or

[11] The New Milford attendance policy has been in effect since 1976. It was initially drafted by a faculty committee that had met with students, parents and members of the defendant board in an attempt to solve the high school's attendance problem. The committee proposal was reviewed by the entire faculty and subsequently adopted by the defendant board.

of the academic sanctions that would ensue from recurrent class absences. The plaintiff asserts only that students had inadequate opportunities to contest whether absences had occurred, whether they were excused or unexcused, or whether they should be waived. The defendants introduced evidence to the contrary. In the absence of express findings by the trial court, we must conclude that the plaintiff class has not met the requirement that the challenged attendance program must be shown to have adversely affected a constitutionally protected right under the facts of this particular case rather than of some possible or hypothetical facts not proven to exist. *General Electric Supply Co.* v. *Southern New England Telephone Co.,* 185 Conn. 583, 593, 441 A.2d 581 (1981); *State* v. *Cuvelier,* 175 Conn. 100, 111–12, 394 A.2d 185 (1978); *Hardware Mutual Casualty Co.* v. *Premo,* supra.

## C

The plaintiff's final constitutional claim invokes the equal protection provisions of article first, § 20, of the Connecticut constitution[12] and the fourteenth amendment to the United States constitution. The plaintiff urges us to hold that because the defendant board's attendance policy permits waiver of grade reductions for unexcused absences, the policy creates two unequal classes of students: students who are denied a waiver and students who are granted a waiver. In part the plaintiff's argument depends upon the assertion that the defendants' classification, because it allegedly affects a fundamental right to education, must meet the test of strict scrutiny. That assertion we have rejected, supra. Even if the applicable test is whether

---

[12] Article first, § 20, of the Connecticut constitution, as amended, provides as follows: "SEC. 20. No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry, national origin or sex."

the waiver provision bears a reasonable relationship to legitimate governmental ends, the plaintiff argues that the waiver provision is constitutionally flawed because it ties eligibility for waiver to a student's "outstanding performance for the latter portion of the marking period." It is irrational, and a violation of equal protection, according to the plaintiff, to waive grade reduction for students who do "outstanding" work and to impose such sanctions on students whose work is, because of academic difficulties unrelated to class absence, only average.

The defendants offer several answers to this argument. Factually, they deny the premise that the waiver provision favors students on account of their ability rather than on account of their effort, since work may be considered "outstanding" in light of a particular student's past performance. Legally, they note that the waiver provision imports a reasonable element of flexibility into the assessment of a student's total classroom performance. Finally, they remind us that a district-wide policy is more likely to assure equality of treatment for all students than is a policy administered on an ad-hoc basis by individual classroom teachers. We find the defendants' arguments persuasive and therefore reject the plaintiff's equal protection claim.

There is no error.

In this opinion the other judges concurred.